# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5467-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

E.E.,

     Defendant-Appellant,

and

T.B., SR., and J.E.,

     Defendants.

_____

IN THE MATTER OF T.B., JR.,
L.B., P.B., and P.O.P.L.,

     Minors.

_____

Submitted October 28, 2019 – Decided December 13, 2019

Before Judges Sabatino and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FN-03-0017-17.

Joseph E. Krakora, Public Defender, attorney for appellant (David Anthony Gies, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Elizabeth Helms Wallace, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (David Ben Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant E.E. (Erica),[1] the mother of four children, appeals an October 20, 2016 Family Part order finding she abused or neglected her three oldest children, T.B. Jr. (Brian), L.B. (Dennis), and P.B. (Margaret), contrary to N.J.S.A. 9:6-8.21(c)(2) and (c)(4), and a June 18, 2018 order terminating the litigation. The court concluded Erica committed educational abuse or neglect against all three children and medical abuse or neglect against Dennis and Margaret. We affirm in part and reverse in part.

---

[1] We employ initials and pseudonyms to protect the privacy of the parties and children. R. 1:38-3(d)(12).

A-5467-17T3

We affirm the court's order as to its educational neglect finding with respect to Brian and Dennis under N.J.S.A. 9:6-8.21(c)(4) because there was substantial credible evidence in the record supporting the court's finding that Erica failed to exercise the requisite minimum degree of care in supplying Brian and Dennis with an adequate education. However, we reverse the portion of the order finding educational neglect regarding Margaret, as the record contains insufficient substantial credible evidence to support such a finding.

Further, we reverse the portions of the order finding Erica medically neglected Dennis and Margaret in violation of N.J.S.A. 9:6-21(c)(2) because the record lacks substantial credible evidence to support the court's finding that the children were currently experiencing or at risk of "protracted disfigurement . . . or protracted loss or impairment . . . of any bodily organ." We also reverse the portion of the order finding medical neglect under N.J.S.A. 9:6-8.21(c)(4) as the record does not contain evidence that Erica had the ability to pay for dental care, that it was available to her, or that the Division of Child Protection and Permanency (Division) offered her such assistance, as required by that statutory provision.

I.

In September 2014, Erica moved from Texas to New Jersey with Brian,

Dennis, and Margaret. The facts underlying the court's abuse and neglect findings stem from an incident on July 11, 2016 in which Erica and the children were at a Walmart in New Brunswick, and Erica became sick and began experiencing pain in her legs and feet. After an employee contacted an ambulance and the police, emergency medical staff responded and transported the family to St. Peter's University Hospital (St. Peter's) in New Brunswick. At the time, the family was residing in a motel in Maple Shade. Brian was ten years old, Dennis was nine years old, Margaret was five years old, and Erica was thirty-six weeks pregnant with P.O.P.L. (Carl).

At St. Peter's, Erica was diagnosed with edema and informed by medical staff that it would be "very dangerous" for her to leave the hospital in her condition, but she nevertheless insisted on leaving. Neither Erica nor Margaret were wearing shoes when they arrived. Further, medical staff at the hospital had concerns about Erica's mental health after she refused to answer questions about herself and the children. Accordingly, a staff psychiatrist contacted the police.

When a New Brunswick Police Department officer arrived shortly thereafter, he made the first of two referrals regarding Erica that the Division received that day. The second referral came from medical staff at St. Peter's who reported that Erica refused to disclose her children's information, provide

A-5467-17T3

contact information for herself or her regular physicians, and was "not making any sense when she [spoke]."

The first Division worker to respond was from Middlesex County, where St. Peter's is located. Shortly thereafter, Jessica Payne, a Division worker from Burlington County, arrived at the hospital.[2] At the fact-finding hearing on October 20, 2016, Payne testified that Erica "indicated that her children had received no formal education and . . . since they've been in New Jersey[,] . . . they had not received pediatric or dental care." After Erica stated that the Division "would not be able to speak to her children" and "show[ed] signs that she was . . . not going to cooperate" with its investigation, the Division executed a Dodd removal of Brian, Dennis, and Margaret.[3]

When they left the hospital, Payne interviewed the children and noticed that they all "had significant speech impediments," which made it "difficult to

---

[2] Payne explained at the October 20, 2016 fact-finding hearing that she became the primary caseworker because "the county is assigned based on the permanent residence of the mother." Because Erica's "license indicated that she was living in . . . Maple Shade," the Division's central screening office assigned her case to Burlington County.

[3] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act," N.J.S.A. 9:6-8.21 to -8.82. N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

communicate with them." The following day, Dennis and Brian "articulated to [Payne] that they did not know how to read and write" and were unable to spell the sentence "walk the dog." Dennis, "unsolicited," told Payne that he was going to "pull [a] tooth out of his mouth himself[,] and that he had done that in the past." Further, Payne testified that an initial physical examination of the children by Jayiddah Thomas-Brown and Jessica Shafer, nurses employed by Rutgers University and working with the Division, revealed that Dennis and Margaret had "visible significant . . . [t]ooth decay."

At the fact-finding hearing, Thomas-Brown testified that she examined Dennis and was concerned about his hygiene and dental health. Specifically, she stated that he had body odor, uncombed hair, dirty clothes, missing teeth, a chipped tooth and "[h]oles in some of [his] teeth," and "reported that he pulled out his teeth when they hurt." Thomas-Brown also noted that although Dennis knew some letters of the alphabet, some numbers, and some colors, he was unable "to completely spell his name."

Shafer, the nurse who conducted Brian's and Margaret's examinations, testified that Brian "struggled" to identify or spell the word "the," and was unable to completely identify all of the letters in the alphabet. In addition, Shafer noticed that Margaret was able to recite the complete alphabet but had

visible dental decay. As a result of the concern for the condition of Dennis's and Margaret's teeth, the Division scheduled an emergency dental appointment for all of the children.

On July 13, 2016, the Division filed an order to show cause and a verified complaint for custody of Brian, Dennis, and Margaret, alleging that Erica abused or neglected the children. In granting the Division custody, the court issued an oral decision noting "concerns about [their] dental . . . [and] bodily hygiene" as well as their difficulties properly communicating and speaking. In the court's corresponding order issued the same day, it permitted Erica supervised visitation and ordered her to attend parenting classes and sign releases for her medical records.[4]

One week later, Renuka Maringanti, D.D.S., administered a dental examination of the children. At the fact-finding hearing, Maringanti testified that Brian had one cavity and that she recommended protective sealants on four other teeth, but did not recommend emergency treatment.[5] However, Maringanti also stated that Dennis had multiple "really deep cavities" which, if neglected,

---

[4] Carl was born on August 1, 2016. Two days later, the Division amended its verified complaint and the court entered an order transferring custody of Carl to the Division.

[5] In its oral decision, the court stated it was "not concerned" about Brian's teeth.

A-5467-17T3

could "spread to the tissues" and lead to swelling and the development of abscesses. Moreover, Maringanti noted that Dennis appeared to have a baby tooth which required a root canal procedure. Maringanti further testified that Margaret had poor oral hygiene, with multiple severe, deep cavities. None of the children had active infections or abscesses at the time of the examination, but Maringanti nevertheless referred them to a specialist pediatric dentist.

In August, Brian and Dennis engaged in the Comprehensive Health Evaluations for Children (CHEC) program at the CARES Institute, which is associated with Rowan University School of Osteopathic Medicine. Brian's composite scores for his testing were at "the upper end of the Lower Extreme range of intellectual functioning," and Dennis's composite score fell within "the Below Average range of intellectual functioning." Both boys were referred to the child study team in Maple Shade for a Basic Skills Intervention program along with one-on-one instruction.

The court held a Title Nine fact-finding hearing concerning the allegations of abuse or neglect on October 20, 2016. The Division presented documentary evidence and testimony from Maringanti, Thomas-Brown, Shafer, and Payne. It did not seek to qualify Maringanti as an expert, but instead offered her lay testimony as the children's treating dentist. Erica introduced one document,

Brian's immunization records, into evidence, but no witness testimony. The Law Guardian presented no documentary evidence or testimony.

At the conclusion of the fact-finding proceeding, the court issued an oral decision in which it determined the Division proved its allegations by a preponderance of the evidence and entered a corresponding order. Specifically, the court found that Maringanti, Thomas-Brown, and Shafer were all credible witnesses, and that Payne was "very professional," "thorough," "extremely experienced," and "very confident." The court stated that, based on the witnesses' testimony and the documents entered into evidence, it had three major concerns:

> One is that the kids have speech impediments, especially . . . [Brian and Dennis] . . . . [Another is] the . . . dental care . . . of [Dennis and Margaret]. [Their] . . . teeth are bad[,] and that is abuse and neglect in and of itself . . . . [T]hey need extensive dental work[,] especially [Dennis,] but [Margaret] also. I agree with the observation that a lot of kids with baby teeth[,] when they're coming out[,] they pull the teeth out. But, there's an extra component to this[,] which is that . . . [Dennis] pulls the teeth out when they hurt. And he's not just playing with his teeth. And that's an indication that [Dennis] has not gotten proper dental care . . . .
>
> The other concern is the schooling. [Erica] says they're home schooled. Not true. That is a pretext. That is a lie. That is a label that [Erica] puts on these kids. [Brian and Dennis] are not schooled at all. They're not registered in school. They don't know their numbers.

9

> They are way behind . . . . [Margaret] is a little . . . young. She probably should be in kindergarten. But the other boys should be . . . in third [or] fourth grade. [Brian] doesn't know his alphabet. He doesn't know how to spell ["]the.["] [Dennis] doesn't even know how to spell his name . . . . He doesn't know colors . . . [or] numbers. And they're not registered with a school district. There's no program. There's nothing. That is abuse and neglect.

Additionally, the court found that the children were being raised as "feral kids . . . who are not educated, who are not going to have any teeth, who are going to have gum disease [and] problems with their mouth, who are not going to be able to speak properly . . . [or] realize their potential . . . ." The court determined that while it "may [have] need[ed] an expert" to determine whether a person had a diagnosable medical condition, lay testimony was sufficient to show "that [a] mother is not educating [her] kids or providing for their development or . . . education."

Accordingly, the court concluded that Erica committed educational abuse or neglect of Brian, Dennis, and Margaret under N.J.S.A. 9:6-8.21(c)(4), and that she committed medical abuse or neglect with respect to Dennis and Margaret under N.J.S.A. 9:6-8.21(c)(2) and (4).[6] The same day, the court also

---

[6] The court also determined that the family was in need of services, pursuant to N.J.S.A. 30:4C-12.

entered a multipurpose order directing Erica to attend counseling, psychological and psychiatric evaluations, and parenting skills courses, in addition to supervised visitation with the children up to three times per week.

At some point prior to a January 4, 2017 compliance hearing, Erica had relocated to Texas. After several more compliance hearings, the court entered a June 13, 2017 order approving the Division's permanency plan. The plan provided for a short-term extension of the Division's custody followed by reunification of Erica and her children in Texas. By the September 15, 2017 compliance hearing, Erica had not engaged in any services previously ordered by the court. That day, the court entered an order extending the Division's original permanency plan by three months for a final time to allow Erica to actively engage in services in Texas.

On December 6, 2017, because Erica was engaging in services, the court entered an order directing the Division to reunify Erica with her children and directing Erica to "immediately register the children in school and schedule medical appointments" for them. On January 29, 2018, the court entered an order transferring legal and physical custody of the children to Erica. After reunification, and because Erica was availing herself and her family of services in Texas, the court terminated the litigation on June 18, 2018. This appeal

followed.

## II.

Appellate review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). In light of the Family Part's "special expertise" in family matters, appellate courts give substantial deference to the trial judge's factual findings when supported by substantial credible evidence. Id. at 412. "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)). The trial judge's legal conclusions, however, are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

In seeking removal of her "name from the child abuse registry and . . . 'substantiation' from any [Division] records," Erica asserts that the court erred in finding that she educationally neglected her children in violation of N.J.S.A. 9:6-8.21(c)(4). Specifically, Erica argues that the Division failed to establish that her conduct was either "likely to put her children in imminent danger and a

substantial risk of harm" or that she failed "to exercise a minimum degree of care."

According to Erica, the record does not support the court's finding of educational neglect because: 1) "her children, when evaluated, were able to participate and function socially and academically," and 2) the court made no finding as to whether Erica was financially able to provide educational care, nor whether the Division offered her assistance to do so. We disagree with Erica's arguments as they relate to the court's findings on educational neglect relating to Brian and Dennis but agree with regard to its findings relating to Margaret.

Under N.J.S.A. 9:6-8.21(c)(4), an abused or neglected child includes:

> [A] child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care (a) in supplying the child with adequate . . . education, medical[,] or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .

The Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Family Servs. v. P.W.R.,

205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). The statute requires a court to consider harm or risk of harm to the child, as opposed to the intent of the abuser, because "[t]he main goal of Title [Nine] is to protect children 'from acts or conditions which threaten their welfare.'" G.S. v. Dep't of Human Servs., 157 N.J. 161, 176 (1999) (quoting State v. Demarest, 252 N.J. Super. 323, 330 (App. Div. 1991)). Further, the phrase "minimum degree of care," as used in N.J.S.A. 9:6-8.21(c)(4), refers to conduct that is not "grossly or wantonly negligent." G.S., 157 N.J. Super. at 178. Therefore, to show a failure to exercise a minimum degree of care, negligence is not sufficient, but intentional behavior is not essential. Id. at 178-79.

"The education of a child has always been of supreme importance and an ideal which has long been required in our State." State v. Vaughn, 44 N.J. 142, 145 (1965). As such, our Legislature must "provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const. art. VIII, § 4, ¶ 1. In turn, parents and guardians have a duty "to ensure their children attend public school or receive equivalent instruction to that provided in the public schools." N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 519 (App. Div. 2018).

Specifically, in New Jersey:

> [e]very parent, guardian or other person having custody and control of a child between the ages of six and [sixteen] years shall cause such child regularly to attend the public schools of the district or a day school in which there is given instruction equivalent to that provided in the public schools for children of similar grades and attainments or to receive equivalent instruction elsewhere than at school.
>
> [N.J.S.A. 18A:38-25.]

A person who breaches that duty "shall be deemed to be a disorderly person," N.J.S.A. 18A:38-31, and such a breach may form the basis of "educational neglect constitut[ing] gross negligence" under Title Nine. S.D., 453 N.J. Super. at 519.

"The reference to education contained in N.J.S.A. 9:6-8.21(c)(4)(a) concerns parental encouragement to truancy of a school age child, or other interference with normal educative processes." Doe v. Downey, 74 N.J. 196, 199 (1977) (quoting Doe v. G.D., 146 N.J. Super. 419, 431 (App. Div. 1976)). When the Division establishes that a child is not enrolled in a public school, the parent or guardian must produce evidence showing that the children are receiving an equivalent education elsewhere. Vaughn, 44 N.J. at 147.

Here, the record supports the trial court's findings that neither Brian nor Dennis were enrolled in public or private school and that her claim that she was

home schooling them was a "lie." The children had not received a formal education since moving to New Jersey in 2014, and prior to the Division's involvement, nothing in the record indicates that they had ever participated in an academic setting.

Further, according to Payne, at the time of the Dodd removal, it was clear that Brian and Dennis had not been provided with an adequate education, and Erica was grossly negligent in failing to provide them with this minimum level of care in this regard, as both children were effectively illiterate. Indeed, Brian, then ten years old, "struggled" to identify or spell the word "the," and he was unable to completely identify all of the letters of the alphabet. Similarly, Dennis, then nine years old, "could not spell his [own] name completely," and neither he nor Brian were able to spell "walk the dog."

Moreover, Dennis's composite score on his CHEC evaluation fell within "the Below Average range of intellectual functioning," and Brian's score was at "the upper end of the Lower Extreme range of intellectual functioning." To the extent Brian and Dennis received any educational instruction at home, it is clear they did not receive "instruction equivalent to that provided in the public schools for children of similar grades and attainments . . . ." N.J.S.A. 18A:38-25.

Under the statute, Erica must have either been "financially able" to provide the minimum level of education or "offered financial or other reasonable means to do so." N.J.S.A. 9:6-8.21(c)(4)(a). The trial court's findings bearing upon this issue were that Erica had been living

> in Maple Shade for at least a year . . . . [T]hat's a good school district . . . in Burlington County. There's lots of services . . . . School districts around here, including Maple Shade[,] take care of the kids. And they're looking for kids like . . . [Dennis] and . . . [Brian].

It further found that "Maple Shade . . . [is] a good district, [in] a good county where . . . services [are] available, and . . . there[] [are] ways to get the services even if people don't have . . . money to pay for them."

We conclude the record supports the court's finding that the Maple Shade school district offered educational services that were available to Erica had she taken any affirmative steps to seek it. Specifically, documents prepared by the child study team for Basic Skills Intervention stated that Maple Shade would provide free special education for Brian and Dennis, pursuant to N.J.A.C. 6A:14. See also Somerville Bd. of Educ. v. Manville Bd. of Educ., 332 N.J. Super. 6, 11 (App. Div. 2000) ("Public education . . . must be provided free of charge to persons over five and under twenty years of age who are 'domiciled within the district.'" (quoting N.J.S.A. 18A:38-1(a))).

A-5467-17T3

Therefore, as Erica resided in Maple Shade, and "[a] child's domicile is normally that of his or her parents," id. at 12, education in that school district would have been free.[7] As such, the court found "a reasonable person would have at least asked the school district for help, which they can provide [in the form of] programs or . . . efforts to educate the kids," and that Erica was grossly negligent for failing to ensure their children were enrolled or otherwise received a comparable education. Because the record supports the court's findings, we conclude the court properly determined that Erica committed educational abuse or neglect of Brian and Dennis in violation of N.J.S.A. 9:6-8.21(c)(4).

With regard to Margaret, however, we conclude the trial court's finding of educational neglect was not supported by substantial credible evidence in the record. In finding that Margaret was educationally neglected, the court stated that she was "a little . . . young" and that "[s]he probably should be in kindergarten." The Legislature does not require children under the age of six years old to attend school. N.J.S.A. 18A:38-25. At the time the trial court made

---

[7] The only apparent prerequisite to academic enrollment is proof of immunization or a valid medical or religious exemption. See N.J.A.C. 8.57-4.2 to -4.4. While the parties do not address the issue on appeal, the trial court noted that Erica simply stated she did not "believe in having [her] children immunized." Through the Division's involvement, the children eventually received immunizations.

its finding, Margaret was five years old. Further, while Margaret was not yet enrolled in school, nothing in the record suggests that Erica failed "to exercise a minimum degree of care" with respect to her education. The only relevant testimony regarding Margaret's education was Shafer's statement that she "recognize[d] [and sang] the alphabet." Accordingly, we reverse the trial court's finding that Margaret was educationally abused or neglected in violation of N.J.S.A. 9:6-8.21(c)(4).

## III.

Erica further contends that the court erred in finding that she medically abused Dennis and Margaret under subsections (c)(2) and (c)(4). Specifically, she argues that "inattention to dental care, particularly of one's primary teeth, does not bring to mind" the type of "permanent or prolonged damage or loss" described in subsection (c)(2) and that the record "is silent as to the type of loss" that Dennis "will suffer if a root canal is not performed on his primary teeth." Further, with regard to the court's finding under subsection (c)(4), Erica claims she "did not have health insurance," and contends that when she asked the Division "for financial assistance, albeit for her family's living conditions, none was offered." We conclude the record lacks substantial credible evidence to determine that Dennis and Margaret were medically neglected under either

19

subsection. As such, we reverse the portions of the court's October 20, 2016 order finding medical abuse or neglect.

N.J.S.A. 9:6-8.21(c)(2) defines an abused or neglected child as one whose parent or guardian "creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ." Further, as noted, subsection (c)(4) defines an abused or neglected child as

> [A] child whose physical . . . condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care (a) in supplying the child with adequate . . . medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so . . . .

In determining whether abuse and neglect has been established, courts "at the trial and appellate level cannot fill in missing information on their own or take judicial notice of harm. Instead, the fact-sensitive nature of abuse and neglect cases turns on particularized evidence." N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 28 (2013) (citation omitted).

Erica first argues that expert testimony was required for the court to demonstrate that "a mother's inattention to her children's dental care . . .

A-5467-17T3

implicate[s] harm . . . [or] physical injury."  The New Jersey Supreme Court has found that treating doctors are "doubtless 'experts,'" but "are more accurately fact witnesses" when testifying about the care they render to a patient.  Stigliano ex rel. Stigliano v. Connaught Labs., 140 N.J. 305, 313-14 (1995).  Due to their unique status, however, our Supreme Court has adopted an expansive view of the scope of questions which may be asked of a treating doctor.  Hutchinson v. Atlantic City Med. Ctr., 314 N.J. Super. 468, 479 (App. Div. 1998).  As such, treating doctors may testify about any subject relevant to a patient's diagnosis, treatment, and prognosis without being qualified as an expert.  Stigliano, 140 N.J. at 314.  Thus, the trial court was permitted to rely upon the testimony of Maringanti, the children's treating dentist, without qualifying her as an expert.

Nevertheless, we conclude the record failed to establish "serious or protracted disfigurement . . . or protracted loss or impairment of the function of any bodily organ" relating to either Dennis or Margaret under subsection (c)(2).[8] Maringanti testified that during her examination, Dennis and Margaret each had multiple deep cavities, and that if such cavities are "neglect[ed] . . . they spread

---

[8] We also note that although the court's October 20, 2016 oral decision and order cited subsection (c)(2), the court did not specifically find that either Dennis's or Margaret's dental condition would lead to "serious or protracted disfigurement . . . or protracted loss or impairment of the function of any bodily organ" presently, or in the future.

21

to the tissues and abscess[es] develop[,] [which] could lead to . . . swelling."  In addition, Maringanti stated her belief that one of Dennis's baby teeth required a root canal procedure and that Margaret had poor oral hygiene.  Maringanti also admitted that at the time of the examination, none of the children had an active infection or abscess.

As noted, appellate courts "cannot fill in missing information on [our] own or take judicial notice of harm."  A.L., 213 N.J. at 28.  Maringanti did not testify that either Dennis's or Margaret's current dental condition constituted "protracted disfigurement . . . or protracted loss or impairment of the function of any bodily organ . . . ."  Nor did Maringanti opine as to the potential long-term effects of cavities, abscesses, swelling, or the children's other dental conditions.  In this regard, Maringanti did not specifically testify, as the court found, that the children were "going to have gum disease."  In addition, although Maringanti testified that Dennis would require a root canal on one of his primary teeth, nothing in the record refers to any current or future harm to the children's permanent teeth.

Further, to the extent the court's oral opinion and order can be construed to have found that there was a risk of "protracted disfigurement . . . or protracted loss or impairment of the function of any bodily organ," we conclude that expert

22

testimony was required, as the knowledge to reach that determination is not within the realm of "common judgment and experience." Campbell v. Hastings, 348 N.J. Super. 264, 270 (App. Div. 2002); see also N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 331-32 (App. Div. 2011) (requiring expert testimony to demonstrate whether an intoxicated parent posed a risk of harm to his child during a supervised visit); N.J. Div. of Youth & Fam. Servs. v. S.S., 372 N.J. Super. 13, 22 (App. Div. 2004) (requiring expert testimony where an infant was at risk of suffering harm based on an abusive parental relationship). We accordingly reverse the trial court's finding of medical neglect against Dennis and Margaret under subsection (c)(2).[9]

Likewise, with regard to subsection (c)(4), we determine the record did not contain substantial credible evidence to sustain a finding under that section as well. As noted, subsection (c)(4) contains a financial capability requirement. Although it was undisputed that Erica lacked health insurance, the trial court found that in Maple Shade, there were "ways to get [dental] services even if people don't have health insurance or money to pay for them." The record, however, does not contain any credible evidence to support this finding.

---

[9] Nothing in our opinion should be construed as approving of the condition of the children's teeth. We merely determine that the record failed to establish abuse and neglect under subsection (c)(2) or (c)(4).

Although courts may take judicial notice of "such facts as are so generally known or are of such common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute," N.J.R.E. 201(b)(2), whether entities in Maple Shade would provide uninsured dental services to Erica's children is not such a fact. Further, no other evidence in the record supports a finding that Erica was financially capable of providing dental care to Dennis and Margaret, that the Division offered Erica financial assistance to do so, nor that she possessed any other reasonable means to do so. As such, we reverse the portion of the court's October 20, 2016 order finding that Erica committed medical abuse or neglect against Dennis and Margaret under subsection (c)(4).

To the extent we have not specifically addressed any of Erica's remaining arguments, we conclude they are without sufficient merit and do not warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5467-17T3